# AMERICAN SECURITY & TRUST COMPANY *v.* PAYNE.

---

### WILLS; TRUSTS AND TRUSTEES; LIFE ESTATES.

1. In construing a will for the purpose of determining whether it is the duty of the trustee thereunder to pay the entire income derived from a trust fund to the life tenant, or to make certain deductions therefrom for the benefit of the remainderman, the question involved is not to be determined by any arbitrary rule, but by ascertaining, if possible, the meaning and intention of the testator from the language employed in the creation of the trust, from the relation of the parties to each other, their condition, and the surrounding facts and circumstances of the case.

2. Where a testator by his will separated the share of his son in his estate from the shares of his other children, bequeathed to the son a specific sum of money for the joint lives of himself and wife, and provided that, if the son survived his wife, he should take the fund absolutely, while, if she survived him, it should go to a trustee in trust to invest, reinvest, and keep invested, and to pay over the income to the son's wife for her life, with power in her to appoint by

will to such of the testator's children or grandchildren as she might elect; and upon the son's death certain bonds which had been bought at a premium, taken from the corpus of the estate, were turned over to trustee by the executor on account of the trust, it was *held* that the trustee had no right to deduct from the income derived from the bonds a sum which would, at the maturity of the bonds, equal the amount of the premium so paid, but that the life tenant was entitled to all of the dividends on the bonds after deduction of expenses of collection.

No. 1973.    Submitted February 9, 1909.    Decided April 6, 1909.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia, sitting as an equity court, in a suit for the construction of a will.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree of the supreme court of the Ditsrict of Columbia in equity.    The appellee, Betty G. Payne, complainant below, filed her bill against the appellant, American Security & Trust Company, a corporation, seeking a construction of the will of William H. Payne, deceased, and especially the eighth clause thereof, for the determination of the rights of the complainant in respect to the income on certain bonds held in trust by the appellant, defendant below, for her use, and requesting that the defendant be instructed and directed to pay over to complainant the whole income received by it upon said bonds, as well as the whole income which may hereafter be received from the same source.

It appears that complainant is one of the beneficiaries under the eighth clause of the last will and testament of William H. Payne, deceased, which provision in the will is as follows:

"8th.    In wills and codicils heretofore made I have separated the share of my son Arthur from the shares of the rest of my children for reasons adequate aand satisfactory to me.    The reasons still continue and I now bequeath to my son Arthur Morson Payne the sum of twenty-six thousand dollars ($26,000) for

and during the joint lives of himself and his wife, Betty; and if my son Arthur survive his said wife, then upon her death to him absolutely; and if his said wife survive him, then upon his death I give and bequeath the said legacy to the company now having an office on G street between Fourteenth and Fifteenth streets N. W., in the city of Washington, and known as "American Security & Trust Company," in and upon the following trusts and none other; that is to say, in trust to invest, reinvest, and keep invested and pay over the income to my said daughter-in-law Bettie for the full term of her natural life, and my said beloved and honored daughter-in-law is hereby empowered to bequeath said legacy to such of my children or grandchildren as she may elect; and in case she does not exercise this power, then from and after her death the said legacy shall go to and be distributed among my own heirs; I should say my own next of kin."

After the death of the testator, a question arose as to whether the executor should pay over to Arthur Morson Payne the said legacy of $26,000, or should retain the same during the joint lives of Arthur Morson Payne and his wife, paying to the husband only the income derived therefrom. This question was taken into the supreme court of the District, and it was there held that the legacy should be turned over to Arthur Morson Payne. On appeal to this court (26 App. D. C. 283, 6 A. & E. Ann. Cas. 784) the finding of the lower court was reversed, and the executor was directed to pay the proceeds of said legacy to Arthur Morson Payne during the joint lives of him and his wife.

On March 13, 1906, the executor petitioned the probate court for directions as to the investment of the legacy, and, upon hearing, the court entered the following decree: "This cause coming on to be heard on the petition of Leigh Robinson, executor of William H. Payne, deceased, this day filed, the letter of Charles C. Glover, as to the value of the Virginia Midland bonds, retained for the purpose of this legacy, and the letter of Arthur Morson Payne, of March 10, 1906, in relation thereto, and the questions presented thereby having been fully con-

sidered by the court, it is, this 13th day of March, A. D., 1906, adjudged, ordered, and decreed that the said Leigh Robinson, executor, be and is hereby authorized and directed to retain as of March 1, 1906, either twenty-three of said bonds, subject to repayment to the estate of $105, or twenty-two of said bonds, leaving a surplus to be invested under the order of the court; and in either case applying to the purpose of the legacy the coupons for interest annexed to said bonds, and payable on the said 1st of March, 1906."

At the time this order was made, the executor had in his possession twenty-three of the bonds of the Virginia Midland Railway, worth at that time on the market 113½. He also had two or more five-hundred-dollar 6 per cent bonds of the Charlottesville & Rapidan Railroad, of the market value of 101. Said bonds had been owned by the testator in his lifetime, and came into the hands of the executor as part of his estate. Pursuant to the above order of court, the executor retained as part of said legacy of $26,000, twenty-two of the said Virginia Midland Railway Company's bonds, of a total market value of $24,970, and two of said Charlottesville & Rapidan Railway Company's bonds, of an aggregate value of $1,010, the remaining $20 of said legacy, together with $3.40, added by Arthur Morson Payne out of his income, being invested in a bond of the Washington Gaslight Company.

On November 5, 1906, the executor returned into court a detailed statement of the setting aside of said railway bonds at their market value as a part of said legacy, and the account was, pursuant to the orders made by the probate court of January 26, 1906, and March 13, 1906, in execution of said mandate of the court of appeals, duly passed and approved. This account also showed the executor's payment to Arthur Morson Payne of the whole proceeds of the interest on said bonds. It further appears that the executor continued to collect said interest and pay over the whole of it to Arthur Morson Payne until the date of his death, October 9, 1907. On January 27, 1908, the executor's action in this regard was duly approved by the probate court's passing and approving his final report and account, in

which such payments were set out, and directing that the legacy be turned over to the American Security & Trust Company, named as trustee in the eighth clause of the will.

The trust company refused to receive the bonds from the executor except upon condition that it be authorized and empowered to deduct from the income accruing to the beneficiary the amount of the difference between the par value of the bonds and the value placed on the same by the probate court at the time they were set aside for the purposes of the trust, such deductions to be added to the principal of the fund. The executor petitioned the probate court to require said trust company to receipt for the fund as then invested and free from the right to make such deductions. On December 23, 1907, the probate court ordered said trust company to receipt specifically for the trust set aside as then invested, but referred to the equity court any questions as to the administration of the trust. The executor accordingly turned over the bonds of the trust company, which has since refused to pay appellee the whole interest on said bonds, but insisted on making deductions in accordance with its proposal to the executor.

The court below, in its decree in the present proceeding, directed the defendant company "to turn over to complainant, Betty G. Payne, or her solicitor of record in this cause, the several amounts over and above its reasonable commission for collection, which it has deducted from the proceeds of coupons for interest on the two (2) bonds of the Charlottesville & Rapidan Railway Company and the twenty-two (22) bonds of the Virginia Midland Railway Company held by said American Security & Trust Company as such trustee, and that henceforth said company, as such trustee, shall collect the coupons for interest on each of said bonds when and as said coupons respectively fall due, and shall thereupon at once turn over to said Betty G. Payne, or her assigns, the full proceeds of each coupon, deducting only its legitimate commissions for collecting; that whether the said American Security & Trust Company, as such trustee, retain said bonds until maturity, or whether it sell said bonds, or whether it sell part and retain part, the amount which

it may receive as the proceeds thereof shall, after deducting any accrued interest, be deemed to be the principal which, by order of the probate court, made December 23, 1907, was directed to be delivered to said American Security Trust Company by the executor of the last will and testament of William H. Payne, deceased; and that, upon any investment or reinvestment thereof by said American Security & Trust Company, the full income thereon shall be paid to complainant, less only the legitimate commission of the trustee for collecting." From this decree the defendant company comes here on appeal.

*Mr. Ward Thoron* and *Mr. Wm. A. McKenney* for the appellant.

*Mr. Fulton Lewis* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

The sole question here presented is whether a life tenant is entitled to all the interest, after deducting expenses, on bonds bought by a trustee when worth more than par. In this case, the sum of $2,980 was paid out of the corpus of the legacy as a premium on the purchase of the bonds in question. In other words, should the life tenant survive the maturity of these bonds, and draw the full interest thereon, the legacy, at the time of the payment of the bonds, would be reduced in amount by the sum of $2,980.

Counsel for appellant relies solely upon the case of *New England Trust Co.* v. *Eaton,* 140 Mass. 532, 54 Am. Rep. 493, 4 N. E. 69. In that case, the court held that where a trustee under a will holds funds in trust to pay the income to a person during his life, the remainder to descend to a certain named remainderman, and makes an investment in bonds at a premium payable at a certain date, he is not required to pay the entire income to the life tenant, but should deduct such an amount for the interest received on each bond as will, at the maturity of the bond, equal the amount of the premium paid thereon.

Mr. Justice Holmes rendered a strong dissenting opinion, concurred in by two of his associates, adhering to the earlier opinion of the court in the case of *Hemenway* v. *Hemenway,* 134 Mass. 446. In that case, Mr. Justice Holmes, speaking for the court, referring to the contention that premiums paid in the purchase of bonds from funds belonging to a life estate should be repaid from the interest, says: "In the first place, the proposed rule reposes upon a fiction. It is not true that premiums are paid for interest alone. They are paid for the safety of the capital as well. Probably, much the greater part of them is made up of this and other elements which ought to fall on the remainderman. The court can hardly be asked to close its eyes upon the truth, in order to lay down a rule which can only be justified on the ground that it is actually beneficial. Moreover, as the decisions of this court show that trustees have been exonerated from liability for investments which turned out not to have been safe, there is not even a technical foundation for the postulate. But we are not only required to start with a fiction. As the next step, we must lay down a fixed and arbitrary rule for what is really in a constant state of fluctuation. For, in order to estimate how much of a given premium is paid for the difference between the interest of the bond and that which the life tenant ought to receive, we have to establish a rate for the latter as our starting point. This would naturally be the market rate, if that were ascertainable. But there would be no justice in stopping at the rate when the bond was bought merely. If theoretical accuracy were possible, the tenant should receive the current rate of interest at every moment. But the current rate is continually varying from day to day and from month to month, apart from the greater variations to be found by taking a series of years. These variations alone would make actual calculations impossible, but they are a strong objection to establishing a constant rate for the interest of the tenant for life. Unless the court should take upon itself to study the market and to make new orders from time to time, it might well come to pass that the judicial rate should differ more widely than that of the bond from the rate of the market." This is the rule of interpre-

tation followed generally, both in this country aand in England.

In the same opinion, referring to the English rule, it is said: "The English cases go the whole length of deciding that, whenever a fund is held upon an authorized permanent investment, the tenant for life receives the entire actual income. Among the investments authorized by statute was East India stock. This yielded a higher rate of interest than the 3 per cent government stock, and was therefore desired by life tenants; but it was liable to be paid off, and it sold at a premium, and was therefore objected to by remaindermen. When a trust fund was in court, the court would not ordinarily direct an investment in this stock (*Cockburn* v. *Peel,* 3 DeG. F. & J. 170; *Ungless* v. *Tuff,* 9 Week. Rep. 729; *Re Boyce,* Ir. Rep. 1 Eq. 45; *Waite* v. *Littlewood,* 41 L. J. Ch. N. S. 636) unless there are special reasons for favoring the life tenant (*Equitable Reversionary Interest Soc.* v. *Fuller,* 1 Johns & H. 379, affirmed in 1861, [30 L. J. Ch. N. S. 848]; Lewin, Tr. 7th ed. 284; *Bishop* v. *Bishop,* 9 Week. Rep. 549; *Cohen* v. *Waley,* 7 Jur. N. S. 937). But in *Cockburn* v. *Peel,* Lord Justice Turner was careful to say that the decision was not intended to embarrass trustees in the exercise of the discretion which the statute gave them when the funds were not in court, and that they would be entitled to protection when they acted bona fide in the exercise of that discretion." In other words, the English courts held that it was within the discretion of a trustee to purchase bonds within the limitations of the statute at a premium, and, when so purchased, the entire income should inure to the benefit of the life tenant. Applying these rules to the case at bar, and considering the evident intent of the testator to especially provide for his "beloved and honored daughter-in-law" during her lifetime, we find no difficulty in disposing of the question before us.

It is important to consider the duties imposed by the terms of the will upon the appellant as trustee. Its duty is "to invest, reinvest, and keep invested and pay over the income to my said daughter-in-law Betty for the full term of her natural life." The life tenant is devested of all power to direct or even sug-

gest as to the kind of investment that should be made. Investment of some kind is necessary in order to produce an income. The investment in the securities here in question was made in accordance with a decree of court before they came into the hands of appellant or the trust provided in the will attached. We are not disposed to disturb the decree approving the investment, even if we could. We are dealing now with the estate as we find it in the hands of the trustee. The trustee is charged with the safe conduct of this estate, not only for the life tenant, but for the remainderman, whoever he may be. It is, therefore, not only the duty of the trustee to secure as large an income as possible for the life tenant, but also to so invest and reinvest from time to time the estate as to produce the largest possible remainder at the death of the life tenant. If the present securities are not accomplishing this result, the duty of the trustee is plain.

Investment by the trustee lying at the foundation of the trust, it is next to impossible, in the natural course of business transactions, to keep the estate intact, neither increased nor diminished, until the expiration of the life estate. Neither do we think that the will contemplated that this should be done. It contemplated the exercise of the best judgment of appellant, in whom the testator seems to have had implicit confidence, in investing the money safely and providently, and paying to his' daughter-in-law the income. As insisted by counsel for appellee, we think the dominant object the testator had in mind, in this clause of the will, was the protection and welfare of the appellee. She was the prominent object of his bounty. Should she die before the son, his reason for making this particular arrangement as to this son, different from that made with respect to his other children, which he states in the will is "for reasons adequate and satisfactory to me," would no longer exist, and the fund was to be turned over to the son in fee. On the other hand, should the life estate descend by the death of the son to the appellee, at her death the object of the testator seems to have been accomplished, and, careless of what may then be-

come of it, he vests in her the power to dispose of it as she may deem best, within certain broad limitations.

The controlling circumstances upon which our decision must rest in this case, without announcing any fixed rule, is this manifest intention of the testator. This seems to be the point on which the decisions of the courts in similar cases turn. Each case must necessarily depend upon its own facts. *Hemenway* v. *Hemenway,* 134 Mass. 446; *Shaw* v. *Cordis,* 143 Mass. 443, 9 N. E. 794; In *McLouth* v. *Hunt,* 154 N. Y. 179, 39 L.R.A. 230, 48 N. E. 548, the provisions of the will creating the trust were, in many essential respects, like those in the case at bar. There, testatrix gave the residue of her estate in three equal parts to her executors in trust to "take, receive, hold, care for, preserve, maintain, invest, and reinvest, convert, sell, lease, and collect the same in all things as in their discretion may seem advantageous for the benefit, respectively, of my three grandsons." Construing this provision of the will the court said: "Notwithstanding the conflict of authority to which I have just referred, there is one principle or rule applicable to this case, with respect to which the parties are all at agreement; and that is, that the questions are not to be determined by any arbitrary rule, but by ascertaining, when that can be done, the meaning and intention of the testatrix, to be derived from the language employed in the creation of the trust, from the relations of the parties to each other, their condition, and all the surrounding facts and circumstances of the case." This rule is approved in the case of *Re Hoyt,* 160 N. Y. 607, 48 L. R. A. 126, 55 N. E. 282.

The fund here was left for investment, and the bonds, while a part of the testator's estate, were not set apart by him as a part of this fund, and must, therefore, be treated as securities purchased by the executor in pursuance of the provisions of the will. Being, then, a mere investment, it is impossible to anticipate the future value of the securities to the estate, or how long the trustee may continue the investment. Should the bonds for any reason enhance in value, it would be the duty of the trustee to sell them and invest the proceeds in other property, or it might be found advisable to sell them in the absence of

such enhancement, and invest in more profitable securities. Let us assume that, by such a change of investment, the corpus of the estate should be greatly increased; the increase would inure to the benefit of the remainderman, and, if a portion of the income had been withheld to make up the premium on the bonds, a manifest injustice would have been perpetrated upon the life tenant. Let us indulge in another assumption, that the trustee be permitted to appropriate to the corpus of the estate sufficient from the income to restore the fund intact at the maturity of the bonds, and continue the investment until that date, and then invest the $26,000 derived from the redemption of the bonds at their face value, together with the original premium restored by deductions from the interest on the bonds, in other property that would thereafter appreciate to an amount greatly exceeding the original value of the trust. The remainderman would profit not only by the enhancement of the proceeds of the original investment, but by the deductions from the income thereon. All this might easily occur within the period of the life tenant.

It seems, therefore, that where the securities or property under consideration do not represent a part of the testator's estate set aside specifically as a life estate, but a mere investment, as in this case, with no limitation placed upon the character of investment the trustee may make, the equitable rule is the one followed by the English courts and by the majority of the courts of this country. Being a mere investment, and since investment is incumbent in order to preserve the capital and secure an income, both of which are equally essential under the terms of the trust, the premium was paid for the benefit of the remainderman as well as the life tenant. Investments will fluctuate; some will increase and others will decrease. The better rule, as approved, we think, by the weight of authority, is to permit these differences to balance and adjust themselves. It is upon this principle of investment that the majority of the courts have held against charging the life tenant with the premiums. *Hite* v. *Hite,* 93 Ky. 257, 19 L.R.A. 173, 40 Am. St. Rep. 189, 20 S. W. 778; *Peckham* v. *Newton,* 15 R. I. 322,

4 Atl. 758; *Bergen* v. *Valentine,* 63 How. Pr. 221; *McLouth* v. *Hunt; Hemenway* v. *Hemenway,* and *Shaw* v. *Cordis,—supra.* While there are courts holding the contrary, we think, under the terms of this trust, that the holding of the court below, to the effect that the premium should not be paid by the life tenant, is right.

We are not called upon to express any opinion or announce a rule applicable to a case where the securities belonged to the testator at death, and were set aside by him as the corpus of the fund creating the life estate; or where the testator directs that the fund constituting the life estate be invested and kept invested in a certain class of securities named in the creation of the trust; or where the fund is composed, in whole or in part, of corporate stock upon which accrued dividends existed at the time of the death of the testator.

The judgment is affirmed with costs, and it is so ordered.

*Affirmed.*